Our third case for this morning, Promotion In Motion at all, the Beech-Nut Nutrition Corporation and number 12-4255, Mr. Wallach and Mr. Dillon. May it please the court. This is not a qualified immunity case, is it? No, because I thought the Uniform Commercial Code took me back to law school. While hearing the last argument, I heard topics, and because we're on the record, I don't want to describe the fog my brain went into. It is not. I do remember when 1983 was first passed, though. But again, that's law school. The question is why 1983 never made it into the initial D.C. Code. And the answer was that the typist at 4.30 in the morning, it dropped out and fell into the wastebasket. So they had to go back and do it. Anyway. This much I do remember. William Wallach of MacArthur and English, Counsel for the Appellants in this matter. And do you wish to reserve time for rebuttal? Approximately three minutes, Your Honor. That's fine. Thank you. As I mentioned a moment ago, this case involves the Uniform Commercial Code, and specifically Article II of the Uniform Commercial Code, which may sound dry and may not be as interesting as many other items that come before the district court and this court. But we maintain serious errors were committed by the court below. So you're relying on what, 2316 or 2612, or what? 2316 for the exclusion of warranties. The primary aspect of this case, Your Honor, because in the limited time I'm not going to, subject to the court's questions, I want to focus on the initial error at the time of trial when I was interrupted during my opening statement and not allowed to present evidence to the jury. I was interrupted based upon an eliminating motion that had been filed three months earlier. What was the evidence you wanted to put in? I wanted to tell the jury to listen and ask themselves, are there any specifications for this food product that they are going to hear from Beechnut, from which the jury could then evaluate whether or not my client produced a product that violated any requirements between the parties. I was not allowed to do that. The trial judge stated that we had waived the ability to do it and that we had stipulated to the existence of the specifications. He did that. Well, let me go back. Maybe you can educate me here. When I look, the only thing that I see is a purchase order. I don't see an overarching contract. And the purchase order says on the back side, I think the very first item is, this is the only, this is an express contract between the parties. And the impression was that with regard to what you were attempting to put in at trial, that it was extrinsic evidence to show, in effect, what this contract meant. But the contract itself, the purchase order, says that this is the express agreement between the parties. I agree with you. How do I get around that? It's not a matter of getting around it, Your Honor. It's a matter of how the two are not irreconcilable. The purchase order itself, and it's Joint Appendix 9. Whose purchase order was it, by the way? Excuse me? Whose purchase order? Beachnut's purchase order, Your Honor. Beachnut's purchase order? But you accepted it, right? We accepted the purchase order. And there were, what, four of them? There were four purchase orders. What does not exist, and I'll come back to Your Honor's question, what does not exist is an overarching contract. The record is full of multiple red-line drafts of a quality agreement and a co-packers agreement that were never agreed upon between the parties. And that was one of the aspects of the evidence we wanted the jury to hear, why my client would not sign the quality agreement and the co-packer agreement, and that's because there were no agreed-upon specifications, which were the key to those contracts. Come back to Your Honor's question. So if there's no signed co-packer agreement, again, but I'm limited now to the purchase order, right? You are, and that's what I want to focus on, because Your Honor asked the right question. We have before us the purchase order, and Paragraph 4 of the purchase order was referenced by the district court in its summary judgment decision. Paragraph 4, which is Joint Appendix, page 9, states quality inspection, and it says PIM warrants that the goods, I'm leaving out a few words here, furnished under the order will comply with the specifications. I'm going to stop right there, if I might, Your Honor. Will comply with the specifications. There is nothing in Well, it goes on, it says, are fit for the purpose intended, merchantable, and free from defects. And as it turns out, they were not free from defects. There were tons of complaints, and that would mean that they weren't merchantable, and what can we do? I'll disagree with, for now, the use of the word tons of complaints. There were less than 200 complaints out of 200,000 cases of product that was manufactured and distributed and sold across the country. Some of those complaints were pretty graphic. There's no doubt about it, and Your Honor's read the record, so I'll say it. Smelled like dead toes. They were moldy. Absolutely. Graphic and descriptive. Quantum of the complaints, though, Your Honor, is one of the key aspects of where the district court is ruling. Which is why the trial was conducted and the question was put to the jury as to the scope and severity of the defect. That seemed perfectly proper, no? Yes. The way the trial, you're absolutely right. Do we have a de minimis problem? Do we have a minor? Is it medium? Is it major? Is it pervasive? I mean, and that question was put to the jury, and sadly for your client, the jury hit you pretty hard. That is absolutely correct, and that is Judge Ambrose referred to. That's Article 2, Section 612 of the Uniform Commercial Code. That deals with substantial impairment. And if you like, I'll address that right now, Judge Hardiman, because you've asked about it. Substantial impairment, as the words themselves indicate, means it can't just be a foot fault. There has to be a determination to the whole contract. Beachnut refers to a different provision of the code that deals with substantial impairment just of one installment. 2612, which was part of the jury charge, agreed to by the parties, requires substantial impairment of the whole contract, of the hundreds of thousands of cases that were ordered and delivered. There is not a scintilla of evidence. Very fancy phrase for saying there's no proof as to what percentage of the product was bad. We've acknowledged some of it was bad, but we don't know was it 1%, 10%, 20%, and there is not a single case. But what we do know is that, back to Judge Hardiman's question, that the jury concluded, well, it wasn't good. The jury made that conclusion, Your Honor. I guess, yeah, and the question is, can the jury make a conclusion that there was substantial impairment without putting a percentage on it? Is that your argument, that the jury had to put a percentage on it? Our argument is that there was not sufficient evidence to support the jury's verdict because it was given no proofs as to what percentage of the product had issues with it. What the jury did was, best as we can tell, just say there was a problem with some product. That is enough. Therefore, the entire contract was breached. Well, the jury said substantial. Isn't that what the question put to the jury was? Yes. The question was, is there substantial proof of a problem with the product? The jury answered, yes, there is. However, Judge Hardiman, there was no evidence presented to the jury that matches any court decision that either side cited that shows a jury can make that determination without there being some indication of how extensive is the problem. And how extensive has to be a percentage? No, that's not a rule of law. I thought the record included, you know, several hundred complaints, the details of the complaints. The record also concluded sort of a clear problem about the absence of availability of pineapple juice, the substitution of the grape juice, et cetera, et cetera. That's all in the record, is it not, that was all put to the jury? That is all there. And I'll try to come back a little bit later to the absence of specifications being presented to the jury. But to stay with what you're asking, we recognize the jury's conclusion. We're challenging the fact that it did not have a basis to make that conclusion due to Beachnut's failure of proof. Beachnut had the affirmative burden of coming forward and stating why there was substantial impairment. Beachnut did not do that. What Beachnut did was introduce approximately 200 customer-consumer complaints that we've talked about. But that's 200 out of several hundred thousand cases of the product that were sold, Your Honor. That is de minimis. Well, not everybody who's unhappy writes a letter. But, you know, your own person within the company sent an October 4 email out saying, this ain't looking too good. That's correct. Ms. Bianchini sent that email. The fuller context, Your Honor, is, and the record established this in discovery. We didn't get to do this fully at trial. Quality control existed at my company's plant, so that if there were issues with product, it did not get out the door. She absolutely stated there were problems with the product. But not everything went out the door. Judge Amber, you also referred to the fact that we know from the record what consumers did complain. That's our record. And that's the record Beachnut relied upon to make its argument that there were customer complaints that substantially impaired the entire value of the contract. It has no way of knowing if anyone else complained. Mr. Wallach, you touched on a number of your points here in your argument, and you touched on the sufficiency of the evidence argument just briefly. Did you file post-trial motions? We did not, Your Honor. So is that argument properly preserved for us? I maintain it is, and Beachnut has not challenged that, Your Honor, so I'm not aware of why it would not be. Isn't that a jurisdictional question for us? I'm asking on behalf of the client to review the jury verdict and for this court to determine there was not substantial evidence supporting it. I don't have to first present it to the court. You have to first present it with a 50-B motion or ask for a new trial with a Rule 59 motion. Right. And I don't see that either of those were filed, and you acknowledge it wasn't. So I just question whether or not we have jurisdiction to review the sufficiency of the evidence argument. Repeating what I said is not going to change anything, Your Honor. I recognize what the court is raising potentially at this time. Beachnut has not made that point. Well, and just going back to your client has a stipulation out there, does it not, that they didn't comply with the express warranties? It does. I'm very happy you asked because I need to put that in context, Your Honor. There were two final pretrial orders entered in this case. The final pretrial order that you're referring to, I'm going to call the amended final pretrial order because that was entered after the court's summary judgment decision. In the amended final pretrial order, it's fact number 35 that Your Honor is referring to that states in so many words, I can look it up, but in so many words that appellants acknowledge the warranties were not complied with. Your Honor, that is because the district court had made the determination that we had breached the warranties. In the original final pretrial order, and this is at joint appendix pages 83 and 84, in the stipulated facts, that fact does not appear because we challenged, we challenged the fact that we had not complied with warranties. It was only after the district court made its ruling. Right, so you were forced into that because of the procedural posture. We were, and in fact, All right, but then that takes us back then to, I think you need to fight the battleground then on the prior decision, which as I understand your argument then and now, you knew you had a problem on the purchase orders, so you were arguing extrinsic evidence, you were arguing course of dealing, you were arguing, look, they put us in a tough spot here because of their specifications, and they didn't do their end of the bargain. You were essentially saying, look, both parties are to blame. Is that fair? Yes, and that a jury, as you've heard other sets of attorneys say to you today, a jury should have been able to hear all the evidence. The result, I don't know, but a jury should have been able to hear, as we put in our brief, the joint collaboration on this product before it was presumed that it was just our product and we're the ones who did not comply with it. The jury should have been able to hear what Beachnut knew about issues such as cloudiness and powder on the product. But Beachnut still said, go ahead and produce. But don't you need to persuade us then that there is some contractual relationship or quasi-contractual relationship between the parties other than the four purchase orders as the trial judge found? And this goes back to Judge Ambrose's question as well. So let me try to answer it this time now for both of you. Looking at the purchase order doesn't end the inquiry because we know the purchase order refers to specifications, but there are none in the purchase order. So extrinsic evidence is needed to understand what specifications are. Hold on, hold on. There are some specifications. The specifications right there, and you stipulated in your Rule 56.1 disclosures, are that it's a natural product that contained natural colors and flavors, no starch or corn syrup, and was soft enough for a toddler to eat, had a 12-month shelf life. The expiration date of which PIM was to stamp in the package. Those are specifications right there. And those we agree to. The trial and the customer complaints were about color, taste, and texture, which are not defined specifications. But then also you warranted that what you were doing would be fit for the intended purpose, merchantable, and free from defects. That is correct. And some of the product, Your Honor, and I have to emphasize some, did not meet standards. That doesn't mean, however, that the jury should not have heard about the joint collaboration and why there were not specifications. Again, I come back to the October 4 email. Wasn't your person saying that at least some of the product was still unfit for the market? She was saying that some of the product that was being manufactured still had issues and quality control addressed it. If I could talk about timing for one moment now, Your Honor, and then I'll address it again on my reserve time if I can. October 8 is important because the other aspect of 2612 of the UCC is the concept of cure. As I said earlier, foot faults are not a breach. There's not a mirror image rule that everything has to match up perfectly. And the UCC goes one step further because it tries to reflect business reality with the law. That even if there is a problem, and even if that problem may have constituted a breach, the party can still cure the breach. And there was evidence presented. How could BeechNut cure this breach other than doing what it did in December by pulling all the product off the market? My client cured the breach, Your Honor, according to BeechNut's own documents, because BeechNut's own documents showed that with the changing ingredients, back to pineapple juice, problems were gone. The product manufactured later in October and November had no issues with them whatsoever. Your Honor, it's October and November of 2008. At no point in time afterwards is there a single BeechNut document or a single BeechNut witness who said what BeechNut's own people determined to be very good was other than very good. So we recognize, as we have to, that earlier production runs did have some issues. But we need to emphasize the point that subsequent production runs had no issues. And I'm not asking you to take my word for it. I'm asking you to look at the record. But that evidence was presented to the jury, correct? It was presented to the jury, and the jury did not accept that. Why don't we get to hear from Mr. Dillon. We'll get you back in rebuttal then. Thank you, Your Honor. You're welcome. Good morning, Your Honor. Good morning, Your Honor. My name is Paul Dillon. I'm here on behalf of the Pele BeechNut together with my co-counsel, David Jaffe, from the firm of King & Spaulding. So let me start off by saying, yes, there was no renewal of motion for a directed verdict at the close of evidence, nor was there a post-judgment motion. That should have been in our brief. It wasn't. It should have been in our brief. In fact, even as to some of the claims on damages, the motion for a directed verdict at the close of BeechNut's case was not at all specific about damages. So I think that also jurisdictionally falls out. And what that means is the appellant's challenge to the sufficiency of the evidence before the jury as to substantial breach, as to cure, and as to damages, all is barred. There's plenty of evidence, not alluded to by my adversary, to support the jury verdict. Beyond the testimony of the internal quality assurance manager for him, she testified to the jury that the product was no good, it never was stable, she wouldn't feed it to her own child, that the product should have been withdrawn from the marketplace. So I think on that alone, BeechNut satisfied the minimum quantity test. Their argument, obviously, albeit technical, but there was a lack of specifications. I know, Your Honor. That led to predictable spoilage. To some extent, Your Honor, I think it's a red herring. Because as you noted, there was a warranty of merchantability and fitness for a particular purpose. And clearly the stipulated complaints show grossly defective product. This was product for toddlers. It's not just a complaint of dead toes. Hundreds and hundreds of complaints. BeechNut's witnesses testified that it was not limited to a geographic area. How many complaints were introduced at trial? How many complaints of customers were introduced? It was hundreds, hundreds. I thought your opponent said it was like 200 or something. I'm going to say low hundreds. We actually introduced the records of receiving the complaints just to show the number of complaints and the fact that they came from all over the country, not limited to a particular lot. So BeechNut's witnesses testified that the complaints were pervasive, the problems were pervasive, and it was impossible to cure on any kind of reasonable basis. In fact, the chart that Mr. Wallach just referenced, if you look at that chart, you'll see under the second to the last column in the chart, BeechNut's evaluations of the product that was being shipped to it. And it says some was good, some was very good, some was very bad, some was bad. I would say, I think it's fair to say that more than half was bad or very bad. So the jury heard the witnesses. This product first went on the market when, September of 07? September, October. And how soon after it went on the market did you begin receiving complaints? I can't answer that question. That would be fairly soon, I guess, because you pulled it in December. Correct. Now, I realize this is sort of the back end. When you discovered the product was bad and it was spoiling, why did you store it and accrue possible damages there? Why didn't you just destroy it? Okay, I think what the stipulations say in the final pretrial order is that BeechNut asked PIM to take the product back. PIM refused. It's not BeechNut's product, in a sense, because it's revoking acceptance. So without instructions from PIM, it was not destroyed. It was not disposed of. It was stored. Perhaps no one expected it to take so long to get through the litigation process. But in any event, that, again, Your Honor, I think goes to the sufficiency of the evidence. I think it's jurisdictionally barred. In terms of the argument, there are some other arguments that PIM made that didn't come up, but the whole specifications argument, if you look at the sidebar that was with Judge Martini, Judge Martini not only quoted from Stipulation 15, he also noted the red herring nature of the argument because of the warranties of merchantability and fitness for a particular purpose. So, Your Honors, I realize I have time left, but I think I've covered my points, unless there's some other question. I think there was an argument about there was an error at summary judgment in dismissing the complaint. Beachnut actually brought the action as a counterclaim. The complaint was dismissed in summary judgment. I think it's a dependent variable type of issue because if Judge Martini was correct on the other two issues, there's no point to the complaint. If the purchase orders are the contract, express warranties were breached, PIM cannot now sue Beachnut for not paying the balance under the purchase orders. That's essentially why I call it a dependent argument. I have no further questions. Thank you, Your Honors. Thank you. Mr. Wallach. If I can just pick up, subject to the Court's questions on the stipulations, again, in the final pretrial order. Judge Martini looked at stipulation number 15 in the pretrial order, which is at page 937 of the joint appendix. He did not look at PIM's disputed fact, also number 15, which is page 943 of the appendix, where PIM expressly disputed the existence of any specifications. My client did not agree to specifications because there were none. It stipulated, with respect to number 15, to the words that were in the final pretrial order. Prior to production, the parties also agreed that the product would meet the specifications for an all-natural product. As Judge Hardiman pointed out, all-natural, that was specified, that was agreed to. But color, taste, and texture, which are what warranties are measured by, which is what compliance, let alone substantial compliance, are measured by. They're saying something more basic than that. It's not just color, taste, and texture. They're saying that there were – it had to be able to be sold, and after a couple of months, it wasn't moving off of shelves, and, in fact, there were so many complaints that they pulled it. I mean, what else are they supposed to do? If the product is that unmerchantable by December? I can't answer a question with a question except to – which means I'm going to do that, Your Honor. That's all right. That's what I figured. All right. Unpredictable. But in October of the same year, when – I mean, this is all happening in a discrete period of time. It's not seven or eight years in the last argument you heard. We're talking about a few months here. The product is on the shelves in August. It's pulled in December. In October of the same year, to answer your question, when BeechNut is thinking there are some problems with the product, what can we do here? What do they do? They order 10,000 more cases, and they say to my client, we expressly hold you harmless from any issue. Two points there, Judge. BeechNut expressly holds my client harmless. That means they're aware of some issues. They've been aware of these issues because of their involvement in the product development the whole time. They also make the determination that the issues are not substantial enough to stop selling the product and making money. 10,000 cases. Your Honor, I – Is there anything in the record explaining BeechNut's motive for holding your client harmless for those particular cases? No. The presumption is was to make money because the product was selling, Your Honor. It was not just sitting on shelves. If not, how is the hold harmless product relevant to whether the fruit nibbles met their warranties, the ones that were previously shipped? Because it's showing that even BeechNut realized the limited nature of issues with some of the product, that they were willing in October, not August at the beginning, not September. You made this argument to the jury. Jury argument. Yeah, you made it to the jury, didn't you? We made the argument to the jury. Yes, Your Honor. Mr. Wallach, I know your point about – and you tried to make it as your opening point that you should have been allowed in your opening statement to talk about the absence of specifications, and the court said that because of the stipulation, you were barred from proceeding forward on that, and you relented and continued with your opening statement. But really, wasn't the court saying that in addition to your stipulation, we're past that, and that the issue for the jury is to determine whether the breach by your client substantially impaired the value of the contract? Isn't that really what the court said? Yes. So what really does the specification have to do with that question? Because it ties in with the summary judgment ruling that we also challenged that did not let us show evidence, as I said earlier, about the joint elements. But that's a separate question. Because to answer – let me try to answer your question, Judge Fischer. For a jury to determine whether or not there's been substantial impairment to the contract, the threshold question for a jury to consider is, what constitutes compliance? What constitutes breach? If there aren't specifications, such as I'm ordering a blue car from – Chevy's still around – from Chevrolet, and I get the car. Is it the blue car I ordered? Well, there's different shades of blue. Same here, Your Honor. There are different shades of color to what my client supplied. There were different degrees of texture to what my client supplied. None of that was allowed to be shown to the jury for them to evaluate the limited question Judge Martini allowed. And Judge Martini framed the trial at summary judgment and then during my opening statement. So it was largely a foregone conclusion as to how much would be awarded. It seems to me that your stipulations in those pre-trial statements allowed that trial to be framed in a way that you subsequently were objecting to. And then Judge Martini said, wait a minute, you already agreed to that. We decided what this trial is going to be about, and it's not going to be about specifications. And as I said earlier, Judge Martini looked at Stipulation 15. He did not look at our disputed fact, Number 15, which expressly made clear we were challenging the existence of any specifications. And that's how the joint stipulation needed to be read. Not mine. Excuse me? It's not my phone. Just turn it off. Still not me. So to come back to your question. I'm dying to see some space behind me. You may have the answer for you. I was being polite. I'm still trying to answer your question. I said the call may have had the answer for you. No, no. It was a lifeline. Okay. I didn't realize it needed a lifeline, so let me be my own buddy, though. Judge Martini framed the trial for the jury to determine whether or not  I addressed that in the brief. I've addressed that in argument. What I'm saying is my final point. A jury cannot determine whether or not a contract has been complied with without knowing what the requirement of the contract is, whether it's a specification or what the nature of the warranty is. And that's what Paragraph 4 of the purchase order talks about, Judge Ambrose, as you pointed out. It's not just that my client would comply with specifications, but that the product would be merchantable. We need to know what was agreed to and what was required. The problem that you have, and it's a major uphill battle. I mean, prior to cases, the issues were, was there enough to get something to a jury? Here, you went to a jury. The jury decided. Unfortunately, you didn't file a motion under Rule 50B or Rule 59 to overturn it post after that time, so now you're really limited. Is there a matter of law that somehow was missed so substantially that we need to send it back? And I'm not seeing it. If the phone was to ring, this is what I would say if I was on the other end of the line. The substantial legal issue that the facts followed from was the jury wasn't able to hear the full picture, Your Honor. It wasn't able to know whose product it was. It wasn't able to know what did Beechner know about the product, but still say, go ahead, manufacture it, we'll take it. None of that was allowed to be shown to the jury, so all the jury did was try to get it back. What you're talking about is you wanted to put in evidence of what, the COPAC agreement? Of the COPAC agreement and what my client would agree to. And how was the COPAC agreement relevant to whether this product produced pursuant to these purchase orders was merchantable? Because it would explain what warranties and what specifications did not exist, and therefore why nothing was. Despite the fact that the purchase order said that this is the express agreement between us? It does. And, Your Honor, the purchase order is black and white, but it doesn't say anything. It's easy to say those are boilerplate words, but that's not enough. Look, I used to do this. There's no such thing as boilerplate. I mean, the words mean something. I disagree with you, Your Honor. The words are that there's a warranty of merchantability, but there's no standard that the jury was able to utilize to evaluate whether or not that standard was met. There are other words. It's the absence of meaning behind those words that the jury should have been allowed to hear. I mean, really the essence of your argument is that the court improperly granted summary judgment to Beachnut. At the outset, yes. At the outset of their claim. That's really what puts you behind the eight ball. That started it, and then it funnels through. The stipulation in the pretrial statement notwithstanding, that dealt with the issues that, I mean, you were precluded by the grant of summary judgment. That is correct. Okay. And now you've challenged that, but you challenged it on the basis that you should have been able to put in evidence of the negotiations and the copacking agreement, which your hurdle is the purchase order. The evidence should have been allowed to be shown to the jury so they could understand what standard the purchase order was creating. Okay. Otherwise, they were just words, and the jury was left with no way to evaluate whether or not there was compliance with those words. Okay. Thank you very much. Thank you to both counsel for well-presented arguments. We'll take the matter under advice.